Filed 3/7/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.V., a Person Coming Under the Juvenile Court Law. | B338420 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP07148) |
| Plaintiff and Respondent, | |
| v. | |
| K.V., et al., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip Soto, Judge. Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant K.V.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant David V.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent Department of Children and Family Services.

Marissa Coffey, under appointment by the Court of Appeal, for Respondent M.V.

———————————

## INTRODUCTION

K.V. (Mother) and David V. (Father) appeal the juvenile court's order terminating their parental rights to daughter M.V. (born 2014). They contend the court erred in its analysis of the beneficial parent-child relationship exception set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i), violated their due process rights, substituted its judgment for that of the Legislature, exhibited bias, and improperly discounted the opinion of the psychologist who performed the bonding study. We affirm the order terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     *Events Prior to and Including the First Appeal*

M.V., then four years old, "came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in November 2018 when law enforcement officers conducting a search at the family's home discovered thousands of pornographic images of children one to 13 years of age. Both parents admitted having child pornography on their phones and that some of the minors depicted could have been younger than 15 years old. Images of a child's vagina on Mother's cell phone were suspected to be images of M.V. [¶] Mother said she exchanged nude photos of herself, engaged in sexual conversations for money, and role-played as a child while performing sexual acts. She admitted posting photographs of M.V. online for money. She had shared images of M.V. in the bathtub but denied sharing naked pictures of her. Mother had

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

agreed to sell a video of M.V., and Father knew this, but she did not share the video because the purchaser did not pay." (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1160.)

M.V. was detained in the home of her paternal grandparents. (*In re M.V.*, *supra*, 87 Cal.App.5th at p. 1160.) In January 2019, the court sustained, as to both parents, allegations related to sexual exploitation under section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse). (*Id.* at p. 1163.) The court declared M.V. a dependent child, removed her from her parents, and ordered reunification services. (*Ibid.*)

Mother and Father received reunification services until November 2020. (*In re M.V.*, *supra*, 87 Cal.App.5th at pp. 1163–1167.) In December 2021, the juvenile court terminated parental rights. (*Id.* at pp. 1173–1174.) On January 27, 2023, we vacated the order and remanded the matter for a supplemental bonding study and a new permanency planning hearing. (*Id.* at p. 1186.)

## II. *Post-Remand Events*

On remand, the matter was transferred to a different bench officer and a new expert, Velia Inez Gonzalez, Ph.D., was appointed to conduct a bonding study.

The permanency planning hearing took place on June 5, 2024. DCFS presented 17 documentary exhibits, all of which were admitted into evidence without objection. Neither the parents nor M.V. offered documentary evidence.

3

A.    Documentary Evidence

1.    Visitation and Relationship of M.V. to Parents

M.V. continued to live with the paternal grandparents, with whom she had lived for most of her life,[2] and she visited with her parents. M.V. said in May 2023 she looked forward to visits with her parents. She felt safe with them, but only because her paternal grandmother (Mary V.) or another adult was with her.

According to M.V., Father fell asleep frequently during visits and this made her sad. It also made her sad that Father did not want her to call her paternal grandmother "Mommy," when that was what she wanted to call Mary V. M.V. never expressed her feelings to Father because sometimes her parents did things they were not allowed to do. For example, although Mother was not allowed to take photos of her, Mother had photographed her when Mary V. was out of the room and then told her not to tell Mary V. This secret photo made M.V. feel scared and angry. Father had done this once as well.

In May 2023, M.V. reported that during visits with Mother they played games, ran around, and sat and talked, but Mother did not do much. Mother used her phone during visits. M.V. was happy playing with Mother, who was more fun than Father because she let M.V. do what she wanted. Mary V. said M.V. "seems to treat the visitations with her mother as if they are play dates," and she looked forward to obtaining gifts from Mother.

---

[2]    M.V. had been placed by the court with her paternal grandparents shortly after her fourth birthday. According to Mary V., M.V. lived with the paternal grandparents in their home more than 50 percent of the time until she was one and one-half years old, and 100 percent of the time thereafter.

In July 2023, Mother told M.V. she did not want M.V. to call Mary V. "Mom." When M.V. said Mary V. liked being called "Mom," Mother began to cry. M.V. comforted Mother. After the visit M.V. commented, "[T]hat was emotional," and appeared shaken by Mother's emotions.

In August 2023, M.V. asked the social worker to deny Mother permission to take M.V. to a museum because M.V. did not want to go. When the social worker asked why M.V. did not want to tell Mother her thoughts directly, M.V. said she knew Mother would be mad.

As of August 2023, most of Mother's visits took place at a mall, where she and M.V. ate, shopped, and worked on M.V.'s homework. Mother purchased many things for M.V., who often wanted many different toys and items. M.V. had come to expect gifts and surprises at Mother's visits and sometimes got upset when she did not get what she wanted. M.V. had twice asked to stay longer with Mother, but it appeared she wanted to continue playing as opposed to being sad about the visit's end.

DCFS observed in January 2024 that M.V. looked forward to visits but was not distraught or sad when they ended. M.V. would ask to cancel or modify planned visits when there was something else she wanted to do, and she complained she was tired of having to visit all the time. M.V. sometimes threw tantrums and refused to move during visits until her parents acquiesced to her wishes.

In March 2024, M.V. told the social worker she wanted Mary V. to be present at her weekend visits with her parents even if there was another monitor.

On April 10, 2024, M.V. told DCFS she did not want an extended visit with Mother, and, in fact, she did not want weekday visits because she wanted to take a class that conflicted with weekday visits, plus on visit days she arrived home too late to do her homework or prepare for evening hockey games. M.V. said she had been told there would have to be different monitors for weekend visits, but she wanted Mary V. to be her monitor.

On April 16, 2024, M.V. said Mother did not listen to her. M.V. said she wanted Mary V. with her when she visited Mother because otherwise Mother would do things she was not supposed to do, like photograph her. Mary V. made M.V. feel safe.

On April 22, 2024, M.V. expressed a concern that if Mary V. were not present at Mother's visits, Mother's friend would say M.V. was bonding with Mother, and then M.V. would have to go live with Mother. M.V. said she had a bond with her grandparents, her uncle, and the social worker, but she did not have a bond with Mother. M.V. said Mother lied, and Mother felt like a stranger to her.

As of June 2024, there were no major concerns about visits or the parents' behavior during visits.

### 2. M.V.'s Well-Being

In 2019 M.V. completed therapy to address trauma and behavioral issues. After this court reversed the order terminating parental rights, M.V. began experiencing mental health issues. She was recalling memories of the 2018 police raid of her home. As of August 2023, M.V. wanted to sleep with her caregivers rather than on her own because she was scared, and she cried at the prospect of sleeping in her bedroom. M.V. said she was afraid of being kidnapped. DCFS referred M.V. for mental health services, as did M.V.'s school.

6

M.V. received therapy with a psychiatric social worker from August to December 2023. The social worker noted M.V.'s grandparents had provided stability for M.V. for a long time and M.V. felt safe in their home. The social worker believed M.V. would benefit from working on socialization skills with her school service provider but that no further assistance was needed.

The paternal grandparents, however, subsequently requested further treatment for M.V., reporting an increase in temper tantrums and crying fits when M.V. was told "no" or other things she did not like hearing. In March 2024, M.V. told DCFS she liked napping in her bedroom because she knew her grandparents were nearby, but she did not like sleeping there on her own because she was afraid of being kidnapped by Mother or Father. As of June 2024, DCFS had again referred M.V. for mental health services.

### 3.    M.V.'s Wishes

In April 2023, the juvenile court ordered DCFS to interview M.V. regarding her attitude toward the termination of parental rights and discontinuation of parental visits.

On July 21, 2023, M.V. asked Mother to allow her grandmother to adopt her.

In August 2023, the social worker asked M.V. what she wanted to happen with her family and said her wishes would be relayed to the court. M.V. responded, "Good! Can you please tell the judge that I want to be adopted?" M.V. explained that if she were adopted, she would be able to continue living in her home, where she felt safe and happy living with her grandparents. The social worker explained adoption to M.V., who said she understood and felt good about the fact that if she were adopted, her parents would no longer be able to make decisions for her,

nor would she return to their care. M.V. said she felt safe and happy residing with her paternal grandparents, whom she called "Mommy" and "Daddy," and said she remembered "bad things" about living with Mother and Father.

The social worker told her that if she were adopted it was possible she would not see her parents as often. M.V. said, "I feel good about it." Her grandparents had told her that she could still visit her parents and she felt all right about not seeing them as frequently.

M.V. did not want to live with her parents because of what Mother did to her when she was younger. M.V. told her grandparents she wanted them to adopt her and she wished Mary V. had given birth to her.

In early January 2024, DCFS reported to the court that M.V. "is a very vocal and expressive child, and she continues to state that her wishes are to be adopted by her paternal grandparents. The concept and meaning of adoption has been explained to [her], and she has indicated that she understands, and still wishes to be adopted. It is true that the child has a favorable view of the birth parents and enjoys the visitation with them; however, the child recognizes the paternal grandparents as her parents and permanent caregivers."

On January 12, 2024, M.V. told DCFS she would like to be adopted by her grandparents. When asked what adoption meant, she repeated, "[A]doption." M.V. wanted to see her parents sometimes, but "not all the time." M.V. wrote a letter to the court in which she said, "Dear Judge, I want to get adopted by Mom and Dad," meaning her paternal grandparents. On March 4, 2024, M.V. told DCFS she wanted to be adopted but to continue to visit with her parents. On April 10, 2024, M.V. related that

Mother had said she and Father would be living together soon, and maybe M.V. could join them. M.V. told DCFS she did not want to live with her parents; she wanted to live with her grandparents.

> 4. M.V.'s Relationship with Grandparents and Experience in Placement

In January 2024, DCFS observed M.V. to seem comfortable, happy, and playful in her placement with her paternal grandparents. M.V. sought her grandparents' attention and intimacy and she was loving and intimate with them as well. DCFS described M.V. as "particularly bonded" with Mary V., and noted M.V. had many times expressed that Mary V. made her feel safe. When M.V. spoke with her grandparents and the social worker, she "freely and openly vocalize[d] her wants and thoughts." The paternal grandparents gave M.V. "love, attention, and a stable and structured lifestyle."

In May 2024, DCFS reported that M.V. continued to thrive in her paternal grandparents' care. They were patient and loving with M.V. and worked to provide her "with structure in her day-to-day life, and to support [her] in her interests in sports and extracurricular activities." M.V. had continued to make steady progress academically, to the point where she was no longer eligible for special education and was transitioned into general education.

### B. Bonding Study

Appointed bonding expert Gonzalez reviewed dozens of documents from the dependency proceedings, observed one monitored visit between M.V. and each parent, spoke with M.V.,

Mary V., and a monitor, and interviewed Mother and Father separately.

1. Father

Gonzalez's assessment took place in the paternal grandparents' home. M.V., Father, and Mary V. were present. Gonzalez found Father to be "actively engaged during the visit, showcasing his dedication to [M.V.'s] growth." She observed he brought both educational and creative materials to the visit, "ensuring a well-rounded approach to her development" and "underlining [Father's] commitment to nurturing [M.V.]'s creative development and engagement in her education." M.V. disobeyed Father's instructions while they played; he imposed no consequences. Gonzalez interpreted this as indicating "his parenting style may lean more towards gentle guidance than strict discipline."

Gonzalez described "a heartwarming and affectionate bond" between Father and M.V.: M.V. approached Father for a hug after play ("demonstrating a strong sense of attachment and comfort in their relationship"), she called him "Daddy" ("demonstrating her fondness for him"), and Father used terms of endearment for M.V. Gonzalez considered M.V. and Father's physical closeness and their use of pet names to "reflect a loving relationship between the father and daughter, fostering a warm and nurturing atmosphere within their family," and she asserted that these "affectionate exchanges contribute to a sense of security, love, and a lasting bond between them."

M.V. enjoyed sharing activities with Father. During the visit, M.V. wanted ice cream, which "led to a shared interest between her and her father." Where M.V. chose to hide during a game of hide-and-seek "highlighted their love for interactive

10

games," and her attempt to surprise Father when he opened the door to the closet in which she was hiding evinced a "light-hearted dynamic [that] underscored the trust and comfort they shared, with [M.V.]'s laughter and enthusiasm contributing to the joyful atmosphere."

Gonzalez found M.V. and Father's water play with a hose demonstrative of "their affectionate relationship and a shared sense of humor, creating heartwarming and positive memories." Father provided M.V. with "educational insights" and "meaningful conversation," such as math discussions, an explanation of a "popcorn" ceiling, and a conversation about slime and chemistry. These interactions, according to Gonzalez, "were emblematic of his commitment to enriching her learning experiences during the visit." M.V. was enthusiastic and curious, and she actively participated in conversation. To Gonzalez, Father's questions about the paint in M.V.'s room "provided an opportunity for them to connect and discuss personal interests." Gonzalez found their communication "integral to their bonding experience."

Gonzalez described M.V. and Father singing to each other as "an entertaining and bonding dimension to their interaction, reflecting her love for singing and their shared enjoyment of music." Father told stories about his childhood that Gonzalez believed "furthered their bond" and "deepen[ed] their connection through a shared memory." Their conversation about an upcoming party M.V. was planning to attend was "lively banter," and Father's playful remark that boys had "cooties" "demonstrated their warm and playful interaction." According to Gonzalez, M.V.'s "reassurance [to Father] regarding the nature of the [upcoming party] showcased her understanding and comfort

11

within their relationship," and these moments "highlighted the diverse and multifaceted nature of their bond, revealing the richness and depth of their connection."

Gonzalez believed Father had shown a "commitment to addressing [the juvenile court's] requirements" by completing elements of his case plan. Father expressed concern that M.V. shared a bed with her grandparents and called them "Mom" and "Dad." Gonzalez said Father "openly acknowledged his past mistakes" and his role in M.V.'s removal from his custody, stating he had experienced years of depression and emotional challenges. He said therapy had played a "pivotal role in helping him address these issues" and gave him a more positive outlook, which has in turn helped him become "more future-oriented and goal-driven."

### 2. Mother

After observing one monitored visit between Mother and M.V. at a mall, Gonzalez concluded the "complex yet affectionate" relationship between M.V. and Mother bore "clear signs of affection and emotional connection." M.V. made "genuine expressions of love and affection" during the visit: Mother and M.V. said they loved each other and shared "moments of laughter, reflecting a warm and emotionally connected bond." Mother caressed M.V.'s head and tried to keep M.V.'s hair out of her eyes, which "underscored the motherly care and attention she provides."

Gonzalez described the interactions between Mother and M.V. as they made slime and shopped as "marked by shared enthusiasm and joy." Gonzalez believed working on M.V.'s homework allowed for "mutual learning and collaboration"; making slime together "created a bonding experience, showcasing their ability to enjoy simple pleasures together;" and Mother's

12

purchase of cards for a popular game indicated her desire to fulfill M.V.'s wishes. Gonzalez opined the activities M.V. and Mother shared, as well as their expressions of affection, "underscore[d] a mother-daughter relationship characterized by a capacity to create cherished moments and joyful experiences."

Gonzalez noticed M.V. challenged Mother's authority, but Mother "appear[ed] to balance firmness with understanding and affection." Gonzalez believed the disciplinary dynamic between M.V. and Mother might be influenced by M.V.'s attachment to Mary V.

The monitor said M.V. became excited about visits with Mother and "eagerly asked if they would do activities like making slime and visiting the candy store." M.V. attempted to persuade Mother to purchase things for her during visits. Gonzalez construed this as indicating M.V.'s "ability to assert her preferences." The monitor thought M.V. was "genuinely happy" to be with Mother.

When Gonzalez interviewed Mother, Mother outlined the services she had undergone and indicated a willingness to engage in further court-ordered classes or therapy to maintain a relationship with M.V. Gonzalez interpreted this as "highlighting [Mother's] commitment to her daughter and to fulfilling court mandates." Mother expressed remorse for her actions and expressed concerns about M.V. sleeping in the same bed as her grandparents and other experiences in the paternal grandparents' home.

### 3. M.V.

Upon meeting Gonzalez, M.V. addressed her as "Ms. Gonzalez" and offered her a drink. Gonzalez found this gesture indicative of M.V.'s politeness and her desire to make a positive

13

impression.  Gonzalez's first impression of M.V. was one of "courtesy and eagerness."

Gonzalez remarked on M.V.'s "ability to articulate her feelings and preferences," finding it indicative of her "emerging sense of self and her capacity to express her needs and desires." M.V. was assertive and self-confident and had a "sense of independence and a strong will."  Gonzalez encouraged that M.V.'s individuality "be acknowledged and respected as she navigates her family dynamics."

Before the visit between M.V. and Mother, M.V. asked to speak privately with Gonzalez and warned her that Mother would behave differently during the visit than she did normally. After the visit, however, M.V. said Mother had been normal during the visit, which Gonzalez interpreted as "suggest[ing] a sense of predictability and consistency in her mother's behavior, which may provide her with a degree of emotional security."

Gonzalez reported M.V. said she felt safe with her parents but wanted to live with Mary V.  Gonzalez stated that M.V.'s interest in continued visits with her parents and her willingness to consider spending the night with them when she was older indicated her desire to maintain connections with her family. M.V.'s choice to call Mother by her first name while calling Mary V. "Mom" "reflect[ed] her unique understanding of her familial roles and a strategy to avoid upsetting her parents."  Overall, M.V. "values her family connections and seeks a sense of stability and normalcy within a complex family structure."

4.     Mary V.

According to Gonzalez, Mary V.'s interactions with M.V. revealed "a finely tuned blend of firmness and affection."  M.V. disobeyed Mary V.'s instructions and then engaged in

oppositional behavior, locking the door to her bedroom. Mary V. remained firm, and M.V. quickly changed her behavior and initiated hugs and kisses. Gonzalez described this as "a remarkable display of emotional adaptability" by M.V. Mary V. reciprocated M.V.'s affection, "a testament to the strength and warmth of the bond between them." M.V. felt comfortable and secure in Mary V.'s "nurturing presence."

### 5. Conclusions

M.V.'s visits with Mother and Father both included physical closeness, shared activities, and affectionate moments. M.V. was comfortable in her parents' presence, "which suggests a secure bond between [M.V.] and her father and mother." M.V. exhibited three of the four behavioral characteristics that define a secure attachment: seeking comfort and support (safe haven), feeling confident to explore her environment (secure base), and staying within close proximity to her parent (proximity maintenance). M.V. did not display the fourth characteristic of a secure attachment, which is displaying signs of distress or discomfort when apart from her parents. Gonzalez concluded this secure attachment pattern "indicates that [M.V.] has developed a strong and positive emotional connection with [Mother and Father]. These relationships provide a stable source of emotional support, comfort, and security for her."

Gonzalez opined preserving M.V.'s relationships with her parents would "present[] numerous potential benefits"; it could "contribute to [M.V.'s] emotional well-being and provide her with a sense of stability in a potentially challenging situation." Terminating her relationship with either parent "could have significant emotional repercussions" for her. It "may result in emotional distress and a sense of loss," and "could potentially

15

lead to confusion, insecurity, and emotional trauma" for M.V. Gonzalez stated that "any abrupt or unjustified termination of the parent-child relationships could adversely impact [M.V.'s] emotional and psychological development." Gonzalez urged that ending M.V.'s relationships with her parents "should only be considered if it is clearly demonstrated to be in [M.V.]'s best interest," and recommended exploring alternative solutions to minimize any potential emotional harm to her.

### C.   Gonzalez's Testimony

Gonzalez testified that in determining whether there is a secure attachment between a child and a parent, psychologists look for four factors: safe haven, proximity maintenance, secure base, and separation distress. When a child has a secure attachment to a caregiver, it shapes their emotional and personality development. A secure attachment with a parent enhances the security of a child's sense of self as they grow: The child identifies with who they are and maintains a historical record of who they were as a child.

Terminating, decreasing, or harming a secure attachment "poses a threat to that child's overall development because that is someone that they've deemed as having an emotional connection to." Gonzalez believed M.V. had a secure attachment to both parents.

#### 1.   Father

The basis for Gonzalez's opinion that M.V. had a secure bond with Father was that during the visit Gonzalez observed, M.V. was very affectionate with Father, stayed close to him, seemed comfortable with him, engaged in a lot of interplay with him, and did not show signs of feeling unsafe with him, even

16

when momentarily left alone with him.  To Gonzalez, M.V. appeared "comfortable being herself" around Father, did not hesitate in her interactions or what she had to say, and was "direct and seemed comfortable speaking her mind."  She liked to "share in different activities with" Father and appeared to enjoy that they had common interests.

Gonzalez opined M.V. and Father's relationship was "shaped by historical stories that they share together, the common interests, their activities and play, [and] their ability to engage in conversations related to schoolwork."  She concluded M.V.'s relationship with Father was not one-sided, "and it involves different interests and actually touches and develops different parts of her brain, like the frontal lobe and temporal lobe and her limbic system, which have to do with emotions and behaviors."

When asked what "specific features" of M.V. and Father's relationship contributed to their bond, Gonzalez identified their mutual affection, their ability to remain in close physical proximity, M.V.'s behaviors demonstrating she felt safe around Father, and M.V.'s evident ability to speak her mind without fear of rejection by Father, all of which Gonzalez observed during their visit.

M.V. was "likely to significantly benefit from continuing" her relationship with Father because she was securely attached to him, "and any secure attachment, maintaining especially with a biological parent, plays a benefit to a child."  Continuing her attachment with Father, Gonzalez believed, would benefit M.V.'s overall development.

Gonzalez believed terminating M.V.'s relationship with Father would be detrimental to her because terminating a secure

17

attachment "can cause a lot of emotional damage and problems with development of their overall personality. And it's in the research which is on attachment theory. When children lose their secure attachments, it causes them to question the loss and it affects how they feel about themselves overall and their connections to others, how they form relationships in the future, whether they believe that person will abandon them in the future, whether they should allow somebody to get close enough knowing that they may not stay. So overall, the attachment theory, which has been researched and tested many times since I believe when it first came around in the '60s, has shown that in the research and testing."

Harm that could come to M.V. from ending her relationship with Father concerned "her development and her sense of self."

Gonzalez could not opine as to whether terminating M.V.'s relationship with Father would be justified because that determination involved factors other than the existence of a secure attachment.

### 2. Mother

During the visit between Mother and M.V., Gonzalez observed Mother and M.V. doing homework together, shopping at the mall, doing an activity at a slime store, eating, and saying goodbye. Similar to the visit with Father, Gonzalez observed that M.V. could tolerate being in close proximity to Mother, behaved in a manner suggesting she felt safe around Mother, and seemed secure enough to express herself without limiting what she said or did during the visit. These behaviors demonstrated three of the four characteristics of a secure attachment, which indicated M.V. had a secure attachment and a significant bond with Mother.

M.V. said she wanted to continue the relationship with Mother; she seemed happy and excited to see Mother and to spend time and engage in activities with Mother; she expressed love for Mother; she showed no discomfort when Mother was near her or touched her; and she exhibited no discomfort being herself.

When asked for her professional opinion of the consequences of terminating M.V.'s bond with Mother, Gonzalez responded, "So for any secure attachment, as I stated, when there is a termination or removal of a secure attachment, it affects a child['s] overall development, their sense of self, their identification with others, how they develop relationships in the future."

### 3.    Cross-Examination by DCFS

Gonzalez testified she had reviewed more than 40 documents, but she did not speak with any social workers. The visit with Father that Gonzalez observed lasted at least three hours and occurred at Mary V.'s home. Observation of one visit with each parent was sufficient for Gonzalez's study because she observed everything she needed to see during the visits.

Gonzalez interviewed Mary V., and while her bonding assessment did not include Mary V., her observations suggested M.V. had a secure attachment with Mary V.

Gonzalez testified that when assessing a parental bond, professionals consider both the parent's bond with a child and the child's bond with the parent. The primary focus was on the child's bond with the parent, but the parent's bond with the child was relevant; for instance, if a child felt they had a secure bond with the parent but the parent did not reciprocate, "then it does pose a detriment to the child." Here, there were secure bonds in both directions.

Gonzalez opined that if parental rights were terminated but M.V. still visited her parents, the secure bonds that currently existed could potentially continue if M.V. "were able to continue her frequency and the same type of relationship that she currently has with Mother and Father."

That M.V. wanted to be adopted would not impact Gonzalez's analysis in a bonding evaluation. That M.V. called her caregivers "Mommy" and "Daddy" would not impact her analysis because M.V.'s attachments to others do not affect her attachments with her parents. It would not affect her analysis if M.V. routinely chose other activities over visiting her parents, because a child's preference for doing something other than visit a family member on a day-to-day basis does not change whether they have a bond to that family member. If, however, during the bonding evaluation, the child preferred to do something other than be with her parents or voiced that preference, that would be significant to the analysis. Had M.V. told Gonzalez she no longer wished to see her parents, Gonzalez would have explored why, but M.V. said she wanted to keep seeing her parents.

Gonzalez testified that because M.V. lived with her paternal grandparents, she would maintain a sense of family history even if parental rights were terminated.

### 4. Questions by the Court

The juvenile court confirmed it was Gonzalez's opinion that it would be detrimental to M.V. to terminate parental rights, and this opinion was based at least in part on M.V.'s statement that she wanted to continue visiting with them.

The court asked Gonzalez if her opinion would change if she knew M.V. had said she felt good about adoption because her grandparents said she could still visit with her parents post-

adoption. Gonzalez testified this would not change her opinion about detriment because of M.V.'s age. A nine-year-old was not mature enough to understand the effect termination of parental rights would have on her connection with her parents or to understand the consequences of termination. A nine-year-old, Gonzalez testified, was too young to know what is best for her. A 12-year-old would also be too young to understand what it meant to terminate parental rights.

Gonzalez testified a child "can start to understand the consequences" of termination of parental rights at an average age of 17 or 18. She was not saying that the courts could not consider whether a child wanted to see their parent until they were 17 or 18 years old, just that the child was not mature enough to understand the consequences until that age. Age 16 was the earliest age at which a child could understand the consequences of their decisions.

Gonzalez testified it would indicate some level of maturity for a child to take into account the feelings of other people when making decisions. The court asked if M.V.'s statement that she felt fine about seeing her parents less often, but Mother would not like it, sounded like M.V. understood the consequences of her feelings and actions in taking somebody else's feelings into account. Gonzalez responded that M.V.'s statement showed she understood she would still be able to see Mother if parental rights were terminated and that Mother wanted to see her more. But, Gonzalez continued, "I don't think she understands that . . . if the bond is terminated, that paternal grandmother has the decision as to whether or not she wants to continue those visits and that they could abruptly stop if paternal grandmother chose to; that

21

now there's no legal rights that Mother or Father have. I don't think she understands those legal consequences."

The court reminded Gonzalez the emotional, not legal, consequences of termination were important because the question was whether termination of parental rights would be detrimental to M.V. emotionally, and then asked if Gonzalez had asked M.V. how she would feel if she did not get to see her parents anymore. Gonzalez said she asked M.V. how she would feel if she did not see her parents anymore, but M.V. responded she did not believe that would happen.

The court asked if Gonzalez had asked M.V. if it would make her feel sad or upset or have any other negative feeling if she were to see her parents less. Gonzalez stated that when she asked how M.V. would feel if she did not see her parents anymore, M.V. responded that she would continue to see her parents. M.V. said when she got older, maybe she would be able to spend the night with them, but she wanted to be older when that happened.

The court asked, "So your position is even though she never said she'd be sad or upset, she's still going to be because we're going to sever the parental bond. Is that basically your position?"

Gonzalez answered, "My position is if she no longer had any contact with Mother or Father or the contact was decreased to—significantly, that it would affect her secure bond with them, which would in turn affect her psychological and emotional development."

D.     M.V.'s Testimony

After Gonzalez's testimony, M.V.'s counsel advised the court that M.V. had made several remarks during Gonzalez's

testimony disagreeing with Gonzalez, and that counsel believed M.V. needed to testify.

M.V. testified she felt "a little bit" safe with Mother and Father. When asked why, M.V. said, "Because when I was younger, I had got treated terribly by my parents. And I didn't like it. And it hurt me really bad." She had never discussed this with her parents. She did not feel ready to talk about it with them. M.V. became emotional during this testimony.

M.V. testified she had a strong bond with Mother and Father. When asked if she wanted to be adopted, M.V. responded, "Yes."

E.     The Juvenile Court's Ruling and Order

The juvenile court found the parents had failed to prove the beneficial parental relationship exception. On the first element of the *Caden C.*[3] analysis, the court acknowledged that all parties agreed the parents had regularly visited M.V. and described visitation as "pretty regular" and "more or less regular." As to the second and third *Caden C.* elements, the court found the parents had not carried their burden of proof: "I don't think there's been adequate evidence, from what I've seen, that it is a beneficial bond despite the doctor's opinion[,] or that the child would be adversely affected detrimentally, emotionally, psychologically affected if this bond were severed." The court concluded, "The [section 366.26, subdivision] (c)(1)(b)(i) exception has not been proven," and terminated parental rights.

Both parents appeal, and each joins the other's arguments.

---

[3]     *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

23

## DISCUSSION

### I.   *Applicable Law*

At the permanency planning hearing, if the court finds that the child is likely to be adopted and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption.  [Citation.]  But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).)

One of the exceptions, the beneficial parental relationship exception, applies when (1) "the parent has regularly visited with the child"; (2) "the child would benefit from continuing the relationship"; and (3) "terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).)  "The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, at p. 632.)

To establish the second element, that the child would benefit from continuing the relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between

24

parent and child, and the child's particular needs.' " (*Id.* at
p. 632.)

"Concerning the third element—whether 'termination
would be detrimental to the child due to' the relationship—the
court must decide whether it would be harmful to the child to
sever the relationship and choose adoption." (*Caden C.*, *supra*,
11 Cal.5th at p. 633.)  "When it weighs whether termination
would be detrimental, the court is not comparing the parent's
attributes as custodial caregiver relative to those of any potential
adoptive parent(s). . . .  Accordingly, courts should not look to
whether the parent can provide a home for the child." (*Id.* at
p. 634.)  "When the relationship with a parent is so important to
the child that the security and stability of a new home wouldn't
outweigh its loss, termination would be 'detrimental to the child
*due to*' the child's beneficial relationship with a parent." (*Id.* at
pp. 633–634.)

The parent bears the burden to show the statutory
exception applies.  (*In re Derek W.* (1999) 73 Cal.App.4th 823,
826.)  When a parent meets that burden, it would not be in the
best interest of the child to terminate parental rights.  In that
case the court must select a permanent plan other than adoption.
(*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

We review the juvenile court's findings using a hybrid
approach: for the first two elements, which require factual
findings (parental visitation and the child's emotional
attachment), we apply the substantial evidence standard of
review; and for the court's weighing of the relative harms and
benefits of terminating parental rights, we use the abuse of
discretion standard.  (*Caden C., supra*, 11 Cal.5th at pp. 639–
640.)  However, when the party with the burden of proof did not

25

carry the burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

II.    ***The Court's Assessment of the Expert's Opinions***

A central issue raised by both parents is the juvenile court's rejection of the opinions expressed by Gonzalez in her bonding study and testimony.  Because the parents' position that the court should have credited Gonzalez's opinions runs through so many of their arguments on appeal, we first address this issue separately.

Evidence Code section 730 allows the juvenile court to appoint an expert to study the bond between a parent and child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.)  The purpose of a bonding study is to obtain evidence of the existence and nature of a relationship to assist the court in adjudicating the applicability of the beneficial relationship exception, or as one court put it, "to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored."  (*In re S.R.* (2009) 173 Cal.App.4th 864, 869; see also *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1167.)  The California Supreme Court has urged juvenile courts to consider ordering bonding studies where requested and appropriate, because "expert psychologists who have observed the child and parent and can synthesize others' observations will be an

important source of information about the psychological importance of the relationship for the child."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633 & fn. 4.)

The court, however, "is not required to accept . . . expert opinion at face value" (*In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1345, abrogated on other grounds as stated in *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 140, fn. 3), and it may deviate from expert witness recommendations "instead of acting as a 'mere rubber-stamp' for what the expert thinks best."  (*In re Marriage of C.D. & G.D.* (2023) 95 Cal.App.5th 378, 386.)

It is the juvenile court's role as trier of fact to weigh the evidence.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52, disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)  The admission or rejection of expert testimony lies largely within the discretion of the court, and its action will not be disturbed on appeal unless the court has abused its discretion.  (*Davenport v. National Reserve Ins. Co.* (1928) 91 Cal.App. 460, 464; *Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 222 [trial court is free to reject expert testimony so long as it does not do so arbitrarily].)  "To establish an abuse of discretion, [a party] must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.'  [Citations.]  A merely debatable ruling cannot be deemed an abuse of discretion.  [Citations.]  An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*People v. Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 390 (*Bryant*).)

It was not an abuse of discretion for the court to reject Gonzalez's opinions. The court's criticism that her opinions were based on studies, not on facts, finds support in the evidence. Gonzalez's study and testimony are heavy on conclusions that may reasonably be perceived as ticking off a psychological checklist based on observing specific behaviors rather than reaching an individualized conclusion taking into account the full range of evidence relevant to whether M.V. had substantial, positive emotional attachments to her parents. For example, based on observing a single visit with Father, Gonzalez concluded M.V. displayed three of the four behavioral characteristics that define a secure attachment: seeking comfort and support (safe haven), feeling confident to explore her environment (secure base), and staying within close proximity to her parent (proximity maintenance). Gonzalez had nothing more to say about the specifics of this relationship—when asked at the hearing to describe the "specific features" of M.V. and Father's relationship that contributed to their bond, Gonzalez did not speak at all about their relationship, their history, M.V.'s emotions, the role Father played in M.V.'s life, etc.—she just returned to identifying affection, proximity, and a sense of safety during the one visit she observed. Gonzalez, moreover, made it clear that seeing these elements during a visit was all she needed to find there was a bond; only if she did not observe the elements of a secure attachment while observing a visit would she observe another.

There was no indication Gonzalez considered that M.V.'s visit with Father took place at her home and in the almost continuous presence of Mary V., or the abundant evidence in the record that M.V. remained traumatized, felt unsafe with her parents unless her grandmother or another adult was present,

28

and resisted sleeping alone for fear her parents would kidnap her. In fact, Gonzalez's many pronouncements that M.V. felt safe with her parents were such a departure from what M.V. had consistently reported that M.V. testified to correct the record for the court.

Gonzalez opined continuing M.V.'s relationships with Mother and Father could offer her non-specific "potential benefits;" the relationships could "contribute to [her] emotional well-being and provide her with a sense of stability in a potentially challenging situation." When asked for the basis for her opinion that continuing M.V.'s relationship with Father would significantly benefit her, Gonzalez gave a vague, superficial answer based on the general principle that all secure attachments benefit children: "The fact that it is a secure attachment. And any secure attachment, maintaining especially with a biological parent, plays a benefit to a child.· From what I know and from [what] I observed, I feel that continuing that secure attachment with her biological father would benefit her overall development." This answer did not illuminate any particular benefits, meaning, value, or importance of the relationship to M.V. or indicate any analysis beyond finding the elements of a secure attachment had been met.

Gonzalez's reliance on general psychological principles rather than the facts of these complex relationships is perhaps most obvious in her assessment of detriment. In the bonding study and in her testimony, Gonzalez's conclusions that termination of the parental relationships would be detrimental to M.V. were generic and based on research findings about the potential impact of termination of secure attachments in general rather than an analysis, guided by psychological principles, of

29

observations and evidence bearing on how M.V. would be affected by losing these *particular* relationships in light of the events giving rise to the dependency petition and thereafter.  What factors suggested to Gonzalez that terminating the relationship with Father would be detrimental?  Attachment theory research, which shows terminating secure attachments can cause emotional damage and development problems.  What, in Gonzalez's opinion, would happen if M.V.'s bond with Mother was terminated?  "So, for any secure attachment, as I stated, when there is a termination . . . of a secure attachment, it affects a child['s] overall development, their sense of self, their identification with others, [and their future] relationships."  These answers by Gonzalez were simply not helpful.

"[H]ow and how much the loss of a relationship with a parent may be harmful, how and how much that harm might be offset by a new family are complex questions."  (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)  The juvenile court could reasonably conclude Gonzalez's superficial answers and her recitation of what psychological research indicated could happen when secure attachments were terminated did not contribute meaningful information to permit the court to assess "how [M.V.] would be affected by losing the parental relationship—in effect, what life would be like for [M.V.] in an adoptive home without the parent[s] in [her] life."  (*Id.* at p. 633.)  Ultimately, " '[a]n expert's opinion is no better than the reasons upon which it is based. [Citations.]' [Citation.]  ' " 'The chief value of an expert's testimony . . . rests upon the *material* from which [their] opinion is fashioned and the *reasoning* by which [they] progress[] from [their] material to [their] conclusion.' " ' " (*David v. Hernandez*

(2017) 13 Cal.App.5th 692, 704.) The juvenile court's assessment of the value of Gonzalez's opinions was not an abuse of discretion.

Father contends it was an abuse of discretion for the court to find the bonding study parent-focused rather than child-focused. The record reasonably permitted this conclusion, as there were elements of the bonding study that appeared to focus far more on what the parents, especially Father, offered to M.V., than whether M.V. possessed a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) For instance, Gonzalez described Father as "actively engaged during the visit, showcasing his dedication to [M.V.'s] growth," bringing to the visit both educational and creative materials and thereby "underlining [Father's] commitment to nurturing [M.V.]'s creative development and engagement in her education," and providing M.V. with "educational insights" and "meaningful conversations" that "were emblematic of his commitment to enriching her learning experiences during the visit."

Father argues the court discounted the bonding study because Gonzalez did not press M.V. into describing how she would feel if she never saw Father and Mother again and because the court "could not wrap [its] head around the fact that . . . Gonzalez opined that a nine-year old child is not sufficiently mature to understand the consequences of termination of parental rights." Mother makes a similar argument. The reductive nature of these arguments obscures the real problem the court identified: Gonzalez did not gather evidence of how M.V. believed she would feel if she did not have any further relationship with her parents, and she discounted

31

M.V.'s express wishes purely because of her age, on the ground that a nine-year-old was too young to be able to know what was best for her. Gonzalez dismissed M.V.'s views because she did not believe M.V. could understand the legal consequences of termination, but the court correctly identified that it was the emotional consequences that mattered; and when the court asked if Gonzalez had asked M.V. how she would feel if she did not get to see her parents anymore, Gonzalez revealed she had dropped the subject when M.V. assured her that would not happen. As a result, Gonzalez effectively omitted M.V.'s wishes (other than her wish for continued contact with her parents) from the equation in her analysis of detriment. The court's questioning clearly reveals that the court was troubled that Gonzalez opined that M.V. would suffer detriment from the termination of parental rights without evidence of M.V.'s feelings on the matter: "So your position is even though she never said she'd be sad or upset, she's still going to be because we're going to sever the parental bond. Is that basically your position?" The court may have inartfully articulated its concerns about Gonzalez's opinions in its ruling, but on the full record of the hearing the reasons for its credibility assessment are clear and well within the bounds of reason. (See *Bryant*, *supra*, 60 Cal.4th at p. 390.)

## III. *The Evidence Did Not Compel a Finding in Appellants' Favor*

Father argues the evidence compelled a finding that M.V. had a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) In this child-focused examination, relevant factors include the age of the child, the portion of the child's life

spent in the parent's custody, the positive or negative effect of interaction between parent and child, and the child's particular needs. (*Id*. at p. 632.) We conclude the evidence did not compel this conclusion.

M.V., born in late 2014, was nine and one-half years old when the permanency planning hearing was held in June 2024. She had been detained from Mother and Father in November 2018, when she was four years old. From this, Father argues that M.V. "had spent over forty percent of her life in Father's and Mother's custody," and that this supports a finding that she had substantial, positive attachments to Father and Mother.

M.V. may have been removed from her parents' custody at age four, but there was evidence in the record to support the conclusion that her paternal grandparents had been taking care of her for most, if not all, of her life. At the time of her removal from Mother and Father's custody, M.V. already lived in the paternal grandparents' home. (*In re M.V.*, *supra*, 87 Cal.App.5th at p. 1160, fn. 2.) Legally, she was removed from her parents' custody in 2018, but as a practical matter, her residence remained unchanged and her parents moved out of the paternal grandparents' home. (*Ibid*.) There was evidence in the record that M.V. had lived with the paternal grandparents since she was one and one-half years old, and that even prior to that, she had been in their care more than half the time. There was also evidence, although disputed, that the paternal grandparents had taken care of M.V. since she was born and that M.V. had been attached to Mary V. as her primary caregiver since she was very young. (*Id*. at pp. 1161, 1167.)

As for the positive or negative effects of interactions, Father points to evidence in the record that M.V. enjoyed her

33

visits with Mother and Father, they interacted well, and the visits were healthy for her. With only a citation to the entire 2600-page clerk's transcript generally, Father asserts, "Indeed, there was no evidence that the effects of visitation between [M.V. and her parents] was anything but positive" for M.V., and he argues this showed she had beneficial relationships with both parents.

The evidence, however, does not establish a beneficial relationship as a matter of law; instead, it demonstrates and reinforces that M.V.'s relationship with her parents was complicated and sometimes negative. As the juvenile court found, the negative effects of M.V.'s contact with her parents were "quite high." There was copious evidence that M.V. did not feel safe with her parents. M.V. slept in her grandparents' bed because she was afraid her parents would kidnap her. She repeatedly told DCFS that she only felt safe with her parents when her paternal grandparents were present, and she requested that Mary V. always be present during parental visits. At one point, M.V. described Mother as feeling like a stranger. Most vividly, after hearing Gonzalez assert repeatedly that M.V. felt safe and comfortable with her parents, M.V. testified at the permanency planning hearing to make her feelings clear. M.V. testified she only felt "a little bit safe" with her parents because of what they had done to her. She remained traumatized and was not ready to discuss these long-ago events with her parents.

Gonzalez may have testified that M.V. seemed to feel comfortable speaking her mind with her parents during the two visits she observed, but there was evidence M.V. did not feel safe directly communicating her thoughts and feelings to them. M.V. reported to DCFS that she did not tell Mother when she did not

want to have a visit because she did not want to hurt her feelings. Rather than telling Mother she did not want to go to a museum, she asked the social worker to deny Mother permission to take her there; she did not want to tell Mother directly that she was not interested because Mother would get angry. When M.V. felt ill prior to a scheduled visit, she did not tell Mother or the monitor because Mother would complain she did not receive her full visitation time and M.V. did not want her grandparents to get in trouble. Father often fell asleep during visits, and he wanted her to stop calling Mary V. "Mommy," both of which made M.V. sad. But she did not tell Father how she felt because sometimes her parents "do things they shouldn't." (This feeling of not being able to talk to Mother and Father was parent-specific: M.V. did not feel the same way about her grandparents or the social worker.)

Contrary to Father's description, visits were not always positive. M.V. threw tantrums at visits, refusing to move until her parents acquiesced to her wishes. Both parents pushed M.V. to stop calling Mary V. "Mom"; Father's disapproval of the name she called M.V. made her sad, and Mother cried about it, leaving M.V. shaken. M.V. felt sad during visits when Father fell asleep. Although Mother was not permitted to photograph M.V., during one visit Mother took a photograph of M.V. when they were alone, and told M.V. it was a secret and not to tell her grandmother. Mother violating the rules and then enlisting M.V. to keep it secret from Mary V. frightened M.V. She regularly mentioned Mother doing things during visits that she was not supposed to do. Father also had taken a photograph of her in violation of the rules.

The evidence does not compel a finding that M.V. had a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Our determination that the evidence did not compel a finding in the parents' favor on the second element of the *Caden C.* test makes it unnecessary to evaluate the third element of the test. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10 (*Katherine J.*).)

IV.   ***Father's Remaining Arguments***

Father contends the juvenile court erroneously "found that Father and Mother failed to meet the first element of the [beneficial parental relationship] exception because they never progressed beyond monitored visitation" or stood in a parental role to M.V. These claims lack merit because the court found Mother and Father visited regularly with M.V.

Father next argues the court erroneously "required the parents to prove they occupied a parental role in [M.V.]'s life when assessing the second element of the exception." We are not persuaded the court applied an incorrect legal standard in assessing the second element. "[T]he beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent. (*In re Dakota H.* [(2005) 132 Cal.App.4th 212,] 229 [a parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits']; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 [118 Cal.Rptr.2d 482] [" 'for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly

36

nonparent relative, such as an aunt'].)  The exception requires the existence ' "of a substantial, positive emotional attachment" ' between parent and child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].)"  (*Katherine J.*, *supra,* 75 Cal.App.5th at pp. 318–319.)  The Supreme Court did not address in *Caden C.* whether a parent must occupy a "parental role" in a child's life in order to form such an attachment.

As the *Katherine J.* court observed, "One popular way in which courts have tried to discern the presence of 'the mysterious X factor' that transforms a person from a mere 'friendly visitor' to a parent with ' "a substantial, positive, emotional attachment" ' to his child is by analyzing whether the person occupies a 'parental role' in the child's life." (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 319.)  The problem with the parental role terminology is that the phrase can be understood in multiple ways, some of which are consistent with *Caden C.* and some of which are not.  (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211–212.)  "Therefore, problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it." (*Katherine J.*, at p. 319.)  Reversal is required in cases where a court merely summarily states the parent had not occupied a parental role and it cannot be determined whether the court considered proper or improper factors.  (See, *e.g., L.A.-O.*, at pp. 211–212 [terse statement that the parents had not occupied a parental role in a long time could indicate either a legally correct analysis or an erroneous one]; *In re D.M.* (2021) 71 Cal.App.5th 261, 268 [reversing where court's analysis of the second element was, "Doesn't know his children's medical needs.  Hasn't attended any dental or medical appointments.  He never asked anyone to

37

attend. Has not risen to the level of a parent"]; *In re J.D.* (2021) 70 Cal.App.5th 833, 864 [reversing termination where the "court's finding on the second element was conclusory and thus problematic—that mother's relationship with J.D. did not 'amount to a parental bond' "].)

Here, while the juvenile court did discuss elements of providing care, the court's comments indicate it ultimately used the concept of "parental role" to signal the opposite of a playmate. Citing to the statement in *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, that there will always be some incidental benefit to a child from visits between a parent and child, the court concluded the parents' visits offered "only incidental benefits for the purposes of entertaining the child[,] like what the courts have described as like a playmate." How children interact with their parents is one of the factors courts consider in evaluating this element (*Caden C., supra*, 11 Cal.5th at p. 632, italics added ["courts often consider how children feel about, *interact with*, look to, or talk about their parents"]), and this conception of "parental role" is consistent with *Caden C.* (See *In re L.A.-O., supra*, 73 Cal.App.5th at p. 211 [it is consistent with *Caden C.* to define "parental role" as not merely frequent and loving contact, pleasant visits, being a friendly visitor, or having an emotional bond].) Accordingly, in this case, the court's use of the term "parental role" was not improper. (See also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1157 ["the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding"].)

Further indication that the court understood the appropriate legal standard for analyzing the second element of

the *Caden C.* test is that after the court made its "parental role" comments, it identified and discussed the other applicable factors set out in *Caden C.* for analyzing whether a child would benefit from continuing a relationship with their parents: M.V.'s age, the portion of her life spent in her parents' custody, and the positive or negative effect of interaction between M.V. and her parents. (*Caden C., supra*, 11 Cal.5th at p. 632.)  Father has not established any error.

V.    ***Mother's Arguments***

"The Due Process Clause entitles a person to an impartial and disinterested tribunal," (*Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238, 242), and " '[i]t is axiomatic that due process guarantees apply to dependency proceedings.' " (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1006.)  Mother accuses the juvenile court of depriving her of due process and acting with bias at nearly every point in the proceeding on remand.  Inter alia, she claims the court was biased against her and in favor of the caregivers, prejudged the case, misapplied the law, twisted the facts, pressured the litigants to contravene their best interests, denied her the benefit of her appointed counsel, engineered M.V.'s testimony to use it against the parents, and unreasonably discounted Gonzalez's opinions to justify discarding them.

" 'Bias or prejudice consists of a "mental attitude or disposition of the judge towards [or against] a party to the litigation." ' " (*Roitz v. Coldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 724.)  "The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect,

39

trial." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589 (*Schmidt*).)

"Mere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see also *Liteky v. U.S.* (1994) 510 U.S. 540, 555 ["[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"].)

"As the trier of fact, the trial court must evaluate the credibility of witnesses and make determinations when conflicting evidence is presented. The trial court's 'reliance on certain witnesses and rejection of others cannot be evidence of bias no matter how consistently the [trial court] rejects or doubts the testimony produced by one of the adversaries. . . . . "[T]otal rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact." ' " (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 154.) "The mere fact that the trial court issue[s] rulings adverse to [a party] on several matters in this case, even assuming one or more of those rulings were erroneous, does not indicate an appearance of bias, much less demonstrate actual bias." (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 674.)

"[T]he burden of proof is on appellant as the party claiming bias to establish facts supporting her position." (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 926.) We review allegations of bias on the basis of the entire record and with the presumption the trial court acted in good faith. (See *People v. Peoples* (2016) 62 Cal.4th 718, 789; *People v. Chatman* (2006) 38 Cal.4th 344, 363–364 (*Chatman*); Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].) We presume the honesty and integrity of those serving as judges. (*Chatman*, at p. 364.)

We find no merit to Mother's allegations. Some of her arguments are presented in a manner that fails to present an issue for our review. Many contradict the record or require a reading of it in a way that defies common sense. Others would require us to adopt the most nefarious interpretations of the juvenile court's statements and actions, which we may not do in the absence of evidence supporting such inferences. "[I]n the absence of a showing to the contrary we must assume that the trial judge performed his duty without bias or prejudice." (*Rosenfield v. Vosper* (1948) 86 Cal.App.2d 687, 694 (*Rosenfeld*).)

A.     Due Process

In Mother's first argument on appeal, she alleges the juvenile court acted as an advocate, directed parties to sign irrelevant documents, instructed the paternal grandparents how to avoid a legal guardianship, attempted to prevent the expert witness from testifying, mischaracterized witness testimony, and relied on speculation rather than evidence to ignore a witness whose testimony did not conform with the court's "predetermined plan." This list of complaints is not supported by any citations to the record, explanation, factual analysis, or cognizable legal argument. Counsel's noncompliance with rules of appellate

41

procedure renders this passage insufficient to present a cognizable issue. The juvenile court's judgment is presumed to be correct, and it is appellant's burden to affirmatively show error. [Citation.] To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

### B. Substitution of Judgment for the Legislature

Mother claims the court substituted its judgment for that of the Legislature and nullified the beneficial parental relationship exception by interpreting it to mean it "did not apply to preserve a nurturing and positive relationship with a child shared with her parents ***because doing so would also benefit the parents***." We find it difficult to imagine a circumstance in which a parent who seeks to preserve their parental rights would not benefit by succeeding. Thus, this seems an unlikely principle to have been announced by the juvenile court, particularly without immediate objection from the parties. Not surprisingly, therefore, at no point on the page of the transcript to which Mother directs this court (without any explanation of what language on this page amounts to her claimed pronouncement), nor indeed anywhere in the court's explanation of its ruling, did the court say it would not apply the beneficial relationship exception if the parents benefitted from maintaining the relationship with their child as well. Rather, the court accurately stated that the analysis of the exception's applicability focuses on the child rather than the parents, which is the law (*Caden C.*,

42

*supra*, 11 Cal.5th at p. 632); criticized the expert's opinion for what it perceived as focusing on benefit to the parents rather than benefit to M.V.; and then began the *Caden C.* analysis. We find no indication in the record that the court ignored, nullified, or misunderstood the exception.

### C.    Post-Adoptive Agreement

Some of Mother's most elaborate allegations of bias and prejudgment center on the issue of a post-adoptive agreement. Adoption by the paternal grandparents had been identified as the permanent plan for M.V. because a concurrent planning assessment was completed in May 2019 and it remained the permanent plan at all times. On April 27, 2023, at the first hearing held after remand and reassignment of the case to a new bench officer, the juvenile court ordered counsel to select an evaluator to perform a new bonding study; and in preparation for that study, it directed DCFS to make an assessment of both adoption and a legal guardianship, prepare a visitation log, and interview M.V. as to her feelings about a possible termination of parental rights and end to visitation. The court also said, "Well, it's a little late in the day, but we're going to have the matter sent out for assessment by the Consortium [for Children] for post-adoptive visits. · And while I may not use that in my analysis, it is something that I think ought to at least be initiated and considered; so if the court is in agreement that parental rights do need to be terminated, that the process for some kind of post-adoptive visits at least be in progress."

Mother characterizes this comment as "evidenc[ing] the court's intended ruling on [M.V.]'s permanency" by "t[elling] the parents to enter into post-adoptive agreements[,] failing to disclose that this would lead to the termination of parental

43

rights." We find no indicia of improper motives or prejudgment from the court's effort to ensure that in the event parental rights were ultimately terminated, M.V. could potentially remain in contact with her parents as she, and presumably they, desired. As adoption had been identified as the permanent plan, for the court to be considering issues relating to a potential adoption was perfectly appropriate and not indicative of bias. Moreover, the court's words and conduct at the hearing contradict Mother's claims: it directed DCFS to assess both adoption and legal guardianship, and it told the parties at this hearing, "We're going to get you a different expert.· We're going to take it from the beginning. I have no preconceived notions about this case since I haven't handled it.· I've read the file all the way back to the original petition, but I haven't come to any conclusions yet.· And we need to have an expert say what it is we have in the way of a relationship and whether or not it would be a detriment to the child to break up that relationship." Finally, we are at a loss to understand Mother's conclusory claim that entering into a post-adoptive agreement would lead to the termination of parental rights given that the court expressly stated at the permanency planning hearing that it was not taking any agreement into consideration.

The court followed up on the possibility of a post-adoptive contract at the hearing on January 17, 2024, instructing counsel for DCFS to explain to the caregivers and the parents what a post-adoptive contract was and to obtain a "firm answer" whether they were willing to enter into one. Mother describes this as "t[aking] matters a step further in pushing for a post-adoption agreement." We see no reason in the record to construe the

44

court's desire to ascertain whether a referral to the Consortium could be fruitful as taking any step or pushing for any outcome.

At the January 17, 2024 hearing, when the court expressed a need to know whether the caregivers would enter into an agreement, Mary V. advised the court it was her intent to do so. However, in late February 2024, DCFS reported to the court that an agreement might not be feasible: Mary V. told DCFS the grandparents preferred to proceed without a post-adoption contract because they did not want to be constrained by an agreement.

When the parties next appeared, on March 6, 2024, the court advised that DCFS was proposing grandparental adoption with a post-adoption contract: "[W]hat the Department is saying is that if we can get a post-adoptive agreement, maybe everybody can agree on that so then we can go forward with an adoption and the parents would have legal rights to visits." The court pointed out to both the grandparents and the parents that DCFS's recommended resolution might not get them everything they wanted but offered benefits to them nonetheless. First, the court reminded the paternal grandparents that while they might dislike the idea of a legalized document concerning visits, if they declined to agree to visits and a contested permanency planning hearing took place, they could end up with a legal guardianship rather than an adoption, which would result in exactly having to adhere to a binding document about visits. Mary V. reaffirmed her willingness to enter into a post-adoptive contract, and the court instructed her to tell DCFS, after which the parties' attorneys would "try and work it all out to see whether or not the parents can go along with that."

Second, turning to the parents, the court warned that "with this family having taken care of this child virtually since birth, the case law says adoption is really the best plan.  And there's a very strong likelihood mom and dad are going to lose on that.  But if we can get you visits so you can maintain a relationship going to birthday parties, things of that nature, you're still going to have an opportunity to be in the child's life."

The court urged the parties to cooperate.  "No one wins these big family fights.  All we do is solidify a lot of animosity.  Because you said something or she said something or the doctor said this or said that against you or against her or whatever, and everybody's upset and they don't want to let go of that anger.  Why do we need to go there?"  The court said it would not keep continuing the case and expressed a desire for prompt resolution.  It said, "[N]ext time we come [to court], I'm hopeful that everybody can agree.  We'll have the child here.  We'll have you here.  We'll have mom and dad here.  We'll have whoever else wants to be here.  And we can get this done as a family.  As a family.  And then, hopefully, this won't take but five minutes to get all of this done.  We don't need to have the doctor [Gonzalez] testify [at a permanency planning hearing] if everybody can agree on the adoption with the post-adoptive agreement."

The court confirmed that counsel for the parents and for DCFS understood, and emphasized that it "want[ed] this worked out."  The court commented, "There really shouldn't be an issue.  The child's been with [the] grandparents for virtually her whole life, and she's nine."  It agreed to Father's request that Gonzalez be ordered back for the next hearing in case no resolution was reached and ordered that M.V. be present for the next hearing, but it observed that if the parents and caregivers were willing "to

46

be reasonable and we can get a post-adoptive agreement, then everybody should agree on the adoption."

Mother views the court's statements at this hearing as demonstrating it "had already made its permanency determination for [M.V.] even before . . . Gonzalez testified"; mandating that the parties enter into a post-adoptive contract; giving legal advice to Mary V.; and directing the caregivers how to avoid a legal guardianship. Mother further alleges that because the court interrupted her counsel while confirming counsel understood the court's wishes, she was "deprived . . . of the benefit of her appointed counsel in order to impose on the parents its directives to sign post-adoption agreements without argument."

At the hearing, the court also said it had previously "chewed out" the lawyers for not trying to resolve the case, observed that sometimes when attorneys were involved, "that's just what happens," and instructed the attorneys to "act[] reasonably." Mother claims the court was denigrating and criticizing the attorneys for attempting to fulfill their ethical obligations to represent their clients.

"Expressions of opinion" as to the advisability of settling a case, or of a party's likelihood of success, when made in what the court "conceives to be a discharge of [its] official duties, do not evidence a bias or prejudice which would prevent [the court] from being entirely fair and impartial in the trial." (*Garcia v. Estate of Norton* (1986) 183 Cal.App.3d 413, 422–423.) While "[r]epeated admonitions to 'settle the case' " may indicate prejudice (*Pacific etc. Conference of United Methodist Church v. Superior Court* (1978) 82 Cal.App.3d 72, 86), here the admonitions to explore whether a resolution could be reached were addressed equally to

47

all sides, focused on bringing the family together in the interest of the child at the center of the dependency proceedings, and were based on reasoned explanations of the benefits of cooperation and the risks both the caregivers and the parents took by engaging in protracted litigation. The court's exhortations demonstrated no bias against any party, only the conviction that it does not serve anyone when adults become entrenched in their positions and fight rather than attempting to reach a cooperative resolution for the benefit of the child involved.

The court's efforts to encourage the parties to explore whether an amicable resolution regarding permanency could be reached indicated not prejudgment of the merits but a recognition of the realities of the situation. Given the legislative preference for adoption and the exceptional circumstances necessary to depart from the norm of adoption (*Caden C.*, *supra*, 11 Cal.5th at p. 631), the duration of M.V.'s life spent with the grandparents, M.V.'s consistent expressions that she felt safe with her grandparents, the evidence she did not feel safe with her parents without her grandmother present, and her consistent, oft-repeated desire to be adopted by her grandparents and to continue to visit with her parents, it was not an expression of bias for the court to agree with DCFS that an agreement for adoption with a post-adoptive contract was worth exploring and could be a potentially beneficial resolution of the case for all.

As for Mother's arguments that she was deprived of her right to counsel, the record does not show that Mother was prevailed upon to execute an agreement or forfeit any right without consulting with her counsel. It is hardly a deprivation of the right to counsel to be referred to the Consortium for Children to explore whether a post-adoption contract could be successfully

mediated. And given the extended delays in obtaining permanence for M.V. that had already occurred, we neither fault the court nor find evidence of bias in the court's criticism of counsel for moving slowly and its demand that the parties determine quickly whether they could reach agreement or whether a contested permanency planning hearing would be necessary. (See *People v. Snow* (2003) 30 Cal.4th 43, 78–79 [it is within the court's discretion to rebuke attorneys for delaying behavior; "manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial"].)

Finally, Mother argues it showed bias that the juvenile court "induced" and "instructed her to sign" a post-adoptive agreement but later nullified the benefit she would have received under the agreement by advising the grandparents, after terminating parental rights, that they had the authority to decide whether to allow parental visitation. The record does not demonstrate that the court instructed, induced, mandated, or forced the parents to agree to a post-adoptive contract. The court expressed its view that the disposition DCFS proposed was a reasonable one that would unite the family in M.V.'s best interest, and that if the parties all behaved reasonably a contested permanency planning hearing could be avoided and a positive outcome reached for M.V. This does not suggest bias and we may not presume bias where none is shown. (*Chatman*, *supra*, 38 Cal.4th at pp. 363–364; *Rosenfield*, *supra*, 86 Cal.App.2d at p.694; Evid. Code, § 664.)

D.  Alleged Attempts to Discredit Gonzalez

Mother interprets the court's decision to reject Gonzalez's opinion as an "attack on her . . . findings to justify ignoring them in order to arrive at its predetermined goal."

49

Some of Mother's claims in this regard contort the court's reasoning. Mother argues the court rejected Gonzalez's opinion because she used "scientifically developed criteria" based on psychological research. The record shows the court did not fault Gonzalez for employing science but for relying on psychological research to the near exclusion of actual facts about M.V., her relationships, and her emotions that would have allowed Gonzalez to meaningfully evaluate the significance of her bonds with her parents. Mother also asserts the court rejected Gonzalez's opinions because she did not respect M.V.'s wishes and she believed M.V. was too young to know her best interest. But as more thoroughly discussed above, the court's concerns regarding M.V.'s preferences and interest appear to have been that Gonzalez reached her opinion on detriment (1) without evidence of how M.V. felt about severing her relationship with her parents, and (2) by discounting M.V.'s express wishes based on a categorical belief that a nine-year-old was too young to be able to know what was best for her, meaning that very little about M.V.'s preferences played into the expert's opinion. Given that the court is statutorily required to consider the child's wishes at the permanency planning hearing (§ 366.26, subd. (h)(1)), the court could reasonably find to be of little value an opinion that largely excluded them from the analysis, and it was entitled as the trier of fact to put more value on M.V.'s expressed feelings and desires than on Gonzalez's circumscribed assessments.

Other allegations contort the record. Mother contends the court revealed its bias against her when it asked Gonzalez whether she had assessed M.V.'s bond with her paternal grandmother, and that this question "reflected the ongoing

50

concern of the court about the grandmother's interests." But the court did not ask that question—counsel for DCFS did. Mother argues the court engineered circumstances to ensure that M.V. testified, thereby traumatizing her and giving the court the opportunities to (1) attribute her trauma to not wanting to be returned to her parents and (2) criticize Gonzalez's opinion for failing to appreciate that trauma. The court did instruct that M.V. be present at the permanency planning hearing, but the court did not invite, prompt, or direct her to testify. Rather, M.V.'s counsel chose to have M.V. testify because M.V. disagreed with the content of Gonzalez's testimony.

Mother's arguments concerning the court's assessment of Gonzalez's testimony largely boil down to disagreeing with the court's credibility determination and blaming it on prejudice. However, as discussed above, it was not an abuse of discretion to reject Gonzalez's opinion. "Finding a witness believable [or not believable] does not demonstrate bias. It demonstrates judgment." (*Schmidt*, *supra*, 44 Cal.App.5th at p. 592.)

Operating on the belief that it was error to "declin[e] to apply the beneficial parental exception in this case after a professional [Evidence Code section] 730 evaluator determined the child would be detrimentally impacted by the termination of parental rights," Mother asserts the court speculated and mischaracterized the evidence to "justify ignoring" Gonzalez's findings and to support its ruling. Basically, Mother claims that having prejudged the case, the court had to find a way to discredit Gonzalez's opinions in order to bring about its "predetermined judgment for adoption." Based on a thorough review of the record on appeal, we reject Mother's speculative claim. "When making a ruling, a judge interprets the evidence,

51

weighs credibility, and makes findings.  In doing so, the judge necessarily makes and expresses determinations in favor of and against parties.  How could it be otherwise?  We will not hold that every statement a judge makes to explain his or her reasons for ruling against a party constitutes evidence of judicial bias." (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1219.)  Mother has failed to show judicial bias denying her a fair trial.  Instead, the record shows the court understood the facts and the law and made a reasonable decision based on the evidence before it.

VI.    *Mother's Briefing*

We must address the regrettable briefing submitted by Mother's appellate counsel.  Mother's appellate briefing is little more than a screed against the juvenile court, imbuing almost its every word or action with a malevolent intent that is not supported by the record.  Mother's appellate counsel postulates a moustache-twirling villain of a juvenile court that "prejudged the permanency with a focus on adoption, never entertaining another permanent plan," resolved from its very first hearing in the case to ensure M.V. was adopted by the paternal grandparents, and "announced" its plan "long before the permanency hearing."  She accuses the court of recognizing the value of Gonzalez's opinions and the danger they posed to its preordained outcome, and alleges the court sought to "derail" Gonzalez and "prevent" her from testifying.  The juvenile court, she declares, made "concerted efforts" to "induce[]" and "force parties to sign a post-adoptive agreement contrary to their parental rights" that would "enable it to ignore" Gonzalez's findings, and it even "mandated [the] parents to act against their best interests."  The court tried to "undermine the right of effective representation to which the

52

parents were entitled" and to "pressurize" the parents' attorneys into acting against their clients' interests. When the court "failed to prevent . . . Gonzalez from testifying altogether, it then made every attempt to discredit her professional evaluation" because it "did not comport with the court's predetermined judgment for adoption." Ultimately, Mother charges, the court "ignored the statutory law" to achieve its ends. This is only a partial list of Mother's counsel's allegations against the juvenile court.

These overheated accusations "cannot be fairly characterized as acts of zealous advocacy" (*Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 857) in an effort to challenge the court's order. Instead, Mother's appellate briefs repeatedly accuse the juvenile court of intentionally refusing to follow and apply the law in a deliberate, long-term plan to manipulate the parties and violate their rights to achieve its preconceived goal. As discussed above, there is no support in the record for such serious charges. When made without evidentiary support, accusations that a judicial officer intentionally refused to follow and apply the law constitute reportable misconduct. (*Id.* at pp. 857–858.)

Additionally, Mother's appellate counsel's language is unprofessional and intemperate. Attorneys have a duty to "maintain the respect due to the courts of justice and judicial officers." (Bus. & Prof. Code, § 6068, subd. (b).) " '[I]t is vital to the integrity of our adversary legal process that attorneys strive to maintain the highest standards of ethics, civility, and professionalism in the practice of law.' " (*In re S.C., supra,* 138 Cal.App.4th at p. 412.) With this contemptuous tirade, counsel's language "lurched off the path of discourse and into the ditch of abuse." (*In re Mahoney* (2021) 65 Cal.App.5th 376, 381.)

"This kind of over-the-top, anything-goes, devil-take-the-hindmost rhetoric has to stop. [¶] If you think the court is wrong, don't hesitate to say so.  Explain the error.  Analyze the cases the court relied upon and delineate its mistake.  Do so forcefully.  Do so con brio; do so with zeal, with passion.  We in the appellate courts will respect your efforts and understand your ardor. . . . [¶] But don't expect to get anywhere—except the reported decisions—with jeremiads." (*Id*. at p. 380.)

We will forward a copy of this opinion to the California Appellate Project—which oversees the work of appointed appellate counsel—for whatever action it deems appropriate.

## DISPOSITION

The order terminating parental rights is affirmed.

**CERFTIFIED FOR PUBLICATION**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.